# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

ERNEST AFAM OFOEDU,       :
        Plaintiff,       :
                        :
v.                        :     Case No: 3:04cv1707 (PCD)
                        :
ST. FRANCIS HOSPITAL AND     :
MEDICAL CENTER, CATHERINE  :
SZENCZY and CAROL SCHUSTER, :
        Defendants.      :

## RULING ON MOTION FOR SUMMARY JUDGMENT & MOTION TO STRIKE

Plaintiff Ernest Afam Ofoedu initiated this action seeking redress for alleged employment discrimination on the basis of race, color, sex, and national origin and for retaliatory discharge, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII") and 42 U.S.C. § 1981.[1]  Defendants now move, pursuant to Rule 56 of the Federal Rules of Civil Procedure, for summary judgment on all remaining counts of Plaintiff's Complaint on the basis that there are no genuine issues of material fact and they are entitled to judgment as a matter of law.  For the reasons stated herein, Defendants' Motion for Summary Judgment [Doc. No. 66] will be **granted**.

Defendants also move to strike portions of Plaintiff's Affidavit.  For the following reasons, Defendants' Motion to Strike [Doc. No. 77] will be **granted in part** and **denied in part**.

## I.     MOTION TO STRIKE

---

[1]    Plaintiff's Title VII claims of race and color discrimination were dismissed in this Court's October 7, 2005 Ruling on Defendants' unopposed Motion to Dismiss, on the ground that Plaintiff had failed to exhaust administrative remedies with regard to those claims. (See Ruling on Defs.' Mot. Dismiss, Oct. 7, 2005, Doc. No. 38.) Plaintiff's Title VII claims against the individual defendants Catherine Szenczy and Carol Schuster were also dismissed on the ground that Title VII does not provide for individual liability. (See id.)

Defendants move to strike certain portions of Plaintiff's Affidavit [Doc. No. 83], arguing that the Affidavit purports to attest to information about which Plaintiff has no personal knowledge and consists of speculation, conjecture, and conclusory allegations. Plaintiff has not filed an Opposition to Defendants' Motion to Strike.

Rule 56(e) of the Federal Rules of Civil Procedure provides that "[w]hen a motion for summary judgment is made . . . an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." It also states that "supporting and opposing affidavits shall be made on personal knowledge, shall set forth facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." The Second Circuit has repeatedly recognized that "under Rule 56(e), only admissible evidence may be used to resist a motion for summary judgment." Rohman v. New York City Transit Auth., 215 F.3d 208, 218 n.6 (2d. Cir. 2000); accord Kader v. Paper Software, Inc., 111 F.3d 337, 342-43 (2d. Cir. 1997); Raskin v. Wyatt Co., 125 F.3d 55, 66 (2d Cir. 1997).

It is well established that courts may strike testimony that is not made on the basis of personal knowledge from consideration on summary judgment. Sellers v. M.C. Floor Crafters, Inc., 842 F.2d 639, 643 (2d. Cir. 1988); Keene v. Hartford Hosp., et al., 208 F. Supp. 2d 238, 242-244 (D.Conn. 2002) (striking portions of affidavit in opposition to summary judgment where affiant failed to establish personal knowledge). It is also well-settled that the court may strike portions of an affidavit that make generalized and conclusory statements. See Hollander v. American Cyanamid Co., 172 F.3d 192, 198 (2d. Cir. 1999).

Defendants argue that portions of Plaintiff's Affidavit are not made on the basis of personal knowledge and should be stricken from the record. Specifically, Defendants challenge paragraphs 18, 21, 23, 25, 27, 29, and 88 as based on nothing more than speculation and conjecture. (See Defs.' Mem. Supp. Mot. Strike at 5.) In paragraphs 18, 21, 23, 25, 27, 29, and 88, Plaintiff attests to various treatment he received and asserts that none of the other managers who were white and/or women were subjected to this treatment. Defendants challenge these comparisons as not based on personal knowledge, claiming that "Plaintiff does not attest that he worked with any of these purported white, female managers" and "fails to provide any factual predicate suggesting that he has personal knowledge of their job duties, their hours of work, their eligibility for overtime wages, their job performance or any other relevant circumstances of their employment." (See Defs.' Mem. Supp. Mot. Strike at 4-5.) Defendants also assert that Plaintiff fails to identify those with whom he compares his treatment and fails to attest that he "personally witnessed" any of these employees perform a job function. Id.

This Court finds that Plaintiff's comparisons to other managers meet the requirements of Rule 56(e). Unlike the statements challenged in the cases cited by Defendants, the comparisons challenged here do not contain hearsay,[2] are not inconsistent with deposition testimony,[3] and do

---

[2]    See Hollander, 172 F.3d at 198 (affirming order which granted in part former employer's motion to strike portions of employee's affidavit which it found was "riddled with inadmissable hearsay, conclusory statements and arguments, and information clearly not made on the affiant's personal knowledge"); Dorazio v. M.B. Foster Elec. Co. et al., 157 Conn. 226, 253 A.2d 22 (1968) (holding that evidence set forth in a counter-affidavit was inadmissible hearsay).

[3]    See Flair Broad. Corp. v. Broad. Co. of Carolinas, 733 F. Supp. 179 (S.D.N.Y. 1990) (striking a portion of an affidavit where subsequent deposition testimony indicated that it was not made on personal knowledge).

not constitute information of which the affiant "clearly" would have no personal knowledge.[4] The comparisons themselves are neither conclusory statements nor arguments,[5] and Plaintiff alleges the "specific, overt acts"[6] which form the basis of his comparisons. Plaintiff represents that these comparisons are based on his personal knowledge and the fact that Plaintiff worked at St. Francis for two years renders him competent to testify to the comparisons he makes. Defendants' arguments regarding the sufficiency of Plaintiff's evidence are better addressed in the context of the summary judgment ruling.

Consequently, much of the language contained in paragraphs 18, 21, 23, 25, 27, 29, and 88 is preserved; only those precise portions deemed by the court to be conclusory and/or clearly not within Plaintiff's personal knowledge are stricken. With regard to paragraph 18, the phrase "contrary to [sic] subsisting and unamended contract of employment," and the words "arbitrarily" and "unilaterally" are stricken. Paragraph 21 is stricken only to the extent it states "over and beyond my tasks and duties as provides in my contract with Defendant" and "so as to over [sic] burden me with responsibility and thereby cause my primary responsibility to suffer to as to portray my work as unsatisfactory." Paragraphs 25 and 27 are stricken only to the extent they use the phrase "contrary to my employment contract." Paragraph 88 is stricken to the extent it uses the word "unfounded." Paragraphs 23 and 29 are preserved in full.

Defendants also move to strike paragraphs 11, 12, and 13 on the ground that they contain

---

[4]    See Hollander, 172 F.3d at 198; see also Schiess-Froriep Corp. v. S.S. Finnsailor, 574 F.2d 123 (2d Cir. 1978) (holding that affidavit of counsel failed to comply with Rule 56(e) because it "plainly" was not based on personal knowledge of the affiant).

[5]    See Hollander, 172 F.3d at 198.

[6]    See Kletschka v. Driver, 411 F.2d 436 (2d Cir. 1969) (affirming a portion of a summary judgment order where plaintiff lodged only general charges of conspiracy and alleged no overt acts).

conclusory allegations of discrimination without any factual predicate.  According to Defendants, these paragraphs contain unsubstantiated speculation that does not amount to competent evidence that could be considered as part of this Court's deliberative process.  Id.  As with the paragraphs discussed above, paragraphs 11 though 13 are stricken only to the extent that Plaintiff makes allegations that are conclusory and/or not within his personal knowledge.  In paragraph 11, the phrases "deliberately and without justification" and "contrary to the terms of my contract of employment" are stricken.  In paragraph 12, the phrase "simply to portray me as inefficient and create a false and pretextual substandard outlook of my work" is stricken.  In paragraph 13, the phrase "because of my, [sic] national origin and gender" is stricken, as are the words "unlawfully" and "pretextual."

Although the portions of Plaintiff's Affidavit that have been preserved may be subject to question at a later phase of litigation, it is not appropriate for the court to strike these statements on summary judgment.  The Second Circuit has clearly established that "credibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury."  McClellan v. Smith, 439 F.3d 137, 144 (2d Cir. 2006) (quoting Fischl v. Armitage, 128 F.3d 50, 55 (2d Cir. 1997)).  Accordingly, the remaining portions of Plaintiff's affidavit will be credited as evidence for purposes of summary judgment and will not be stricken from the record.

## II.    PLAINTIFF'S RULE 56(A)2 STATEMENT

Defendants, in their Reply brief, argue that summary judgment should be granted in their favor in part because Plaintiff's Rule 56(a)2 Statement failed to comply with Local Rule 56(a)2. (See Defs.' Reply I at 3-4.)  A failure to meet the requirements of Rule 56(a)2 can be grounds for

summary judgment. <u>Willis v. Anthem Blue Cross & Blue Shield</u>, 193 F. Supp. 2d 436, 438 (D. Conn. 2001) ("The purpose of a Rule [56(a)2] Statement is to make affirmative statements which will aid and inform the Court. Quite naturally, the complete failure to comply with the requirements of such a rule would be grounds for summary judgment in and of itself.") (<u>citing, among others</u>, <u>Dusanenko v. Maloney</u>, 726 F.2d 82, 84 (2d Cir. 1984); <u>Wyler v. United States</u>, 725 F.2d 156, 158 (2d Cir. 1983); <u>Nucifora v. Bridgeport Board of Education</u>, 188 F. Supp. 2d 197 (D. Conn. 2001)).  In this case, however, in an effort to avoid prejudice to Plaintiff based on the deficiencies of his attorney, this Court ordered Plaintiff to file a revised Rule 56(a)2 Statement in compliance with the Local Rules.  Plaintiff filed a revised Rule 56(a)2 Statement within the time specified in this Court's Order, and as such, the revised statement will be considered.  Any denials not properly supported by citations to the record, however, are improper and the material facts asserted by Defendant in its corresponding paragraph will be deemed admitted.[7] <u>See</u> <u>SEC v. Global Telecom Servs. L.L.C.</u>, 325 F. Supp. 2d 94, 109 (D. Conn. 2004) ("Fed. R. Civ. P. 56 does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute."); <u>Root v. Liston</u>, 363 F. Supp. 2d 190, 191 n.1 (D. Conn. 2005); <u>Martin v. Town of Westport</u>, 329 F. Supp. 2d 318, 323 n.1 (D. Conn. 2004).

Defendants also submitted a Reply Memorandum to Plaintiff's Amended Rule 56(a)2 Statement, in which they argue that Plaintiff's Amended Statement suffers from additional

---

[7] Plaintiff did not support his denials with any citations to the record in paragraphs 19, 21, 23, 26, 38 through 41, and 44 of his Amended Rule 56(a)2 Statement, and as such, the material facts asserted by Defendants in paragraphs 19, 21, 23, 26, 38 through 41, and 44 of their Rule 56(a)1 Statement are deemed admitted.

deficiencies.  Those arguments will be addressed, as necessary, in the following section.

## III.   MOTION FOR SUMMARY JUDGMENT

### A.   Background

Plaintiff was hired by St. Francis Hospital ("St. Francis") on July 17, 2001 as a part-time

Coding Specialist in the Medical Records Department. (See Defs.' Rule 56(a)1 Statement ¶ 1.)[8]

Plaintiff was hired by Faye Davis, a black female from Jamaica, who was then employed as the

Coding Manager in the Medical Records Department. (Id. ¶ 2.)  Effective April 28, 2002,

Plaintiff was promoted to the position of Transcription and Record Processing Manager in the

Medical Records Department. (Id. ¶ 3; Ofoedu Dep. I at 99:6-25, 108:9-19, Aug. 10, 2005.)

In his Managerial position, Plaintiff supervised the medical records clerks and the

transcriptionists.  The medical records clerks were responsible for processing the medical records

of discharged patients. (Defs.' Rule 56(a)1 Statement ¶¶ 3-4.)  The transcriptionists were

responsible for transcribing medical records dictated by physicians. (Defs.' Mem. Supp. Mot.

Summ. J. ("Defs.' Mem. Supp.") 3.)

Plaintiff was responsible for correcting deficiencies in medical records files so that the

files could be placed in permanent storage, as well as for minimizing the number of incomplete

files because they negatively affected the hospital's Medicare reimbursements and were a factor

in meeting accreditation requirements. (Defs.' Rule 56(a)1 Statement ¶¶ 3-4.)  Plaintiff was also

responsible for calculating the medical record delinquency rate and for suspending the privileges

of physicians to practice at St. Francis who did not sign off on their reports or correct other

---

[8]        With regard to facts taken from Defendants' Rule 56(a)1 Statement, the facts are admitted unless
otherwise noted.

deficiencies in their medical records in a timely manner.[9] (Id. ¶ 5.)

On or about March 26, 2003, Carol Schuster became the Director of Medical Records and began supervising Plaintiff and other Medical Records employees, including Joyce Downey and Faye Davis. (See Defs.' Rule 56(a)1 Statement ¶ 6.)  Ms. Schuster met with Plaintiff on November 18, 2003 and presented him with his 2003 performance evaluation, in which she identified several areas in which Plaintiff's performance required improvement. (Id. ¶¶ 7-8.)  For example, in Section 2 of the evaluation, Ms. Schuster noted:

> With regard to the Processing/Analysis staff, I have requested but have not seen productivity measures.  One of [Plaintiff's] goals for the upcoming year is to establish those measures and report monthly . . . . At this point it is difficult to assess whether or not there is adequate coverage in all areas.

(Id. ¶ 8.)  Ms. Schuster also raised concerns about Plaintiff's failure to meet deadlines, writing:

> As a new manager within the Department, [Plaintiff] has worked hard to make significant improvements within his sections.  He is making progress, but still has opportunities for improvement.  During the next year, I would like to see [Plaintiff] be more considerate of the department as a whole.  I encourage him to work more closely with his peers and seek additional support from myself. [Plaintiff] is often late when assigned tasks and sometimes struggles with producing the desired outcomes.  He should strive to be more timely and seek further explanation if the instructions are not clear.

(Id. ¶ 9; Schuster Aff., Ex. A.)  Plaintiff was rated as having rendered an overall "quality

---

[9]     According to Defendants, part of Plaintiff's job duties included determining physician delinquency and then sending a series of letters to delinquent physicians requesting completion of the records. If the physicians failed to complete their records by a certain date, Plaintiff was responsible for issuing suspension notifications. (Schuster Aff. ¶ 8; Ex. B to Schuster Aff.; Ofoedu Dep. I at 121:22-25, Aug. 10, 2005.)  Plaintiff argues that, in practice, he did not have the power to suspend any physician, but was required to bring the issue to the attention of the co-chairs of the Medical Records Committee, who would intervene and get the physicians to sign off on their charts. (See Pl.'s Rule 56(a)2 Statement ¶ 5; Ofoedu Aff. ¶ 50.)  Plaintiff, however, admits in his Rule 56(a)2 Statement that he performed the practice at times, and testified during his deposition that it was his "responsibility to make the decisions regarding physician suspensions" and that Ms. Schuster later removed this responsibility in late 2003 or early 2004. (Pl.'s Rule 56(a)2 Statement ¶ 5; Ofoedu Dep. I at 121:22-25.)  Accordingly, the facts set forth in paragraph 5 of Defendants' Rule 56(a)1 Statement are deemed admitted.

performance" for the 2003 evaluation period. (Schuster Aff., Ex. A.)  The Performance Appraisal

included a section for Plaintiff to comment on his review, however, he did not provide

comments. (Defs.' Rule 56(a)1 Statement ¶ 10.)  Defendants contend that Ms. Schuster had

discussed her concerns regarding Plaintiff's performance several times with him prior to their

meeting for his annual review. (Defs.' Mem. Supp. 5 (citing Schuster Aff. ¶ 4.).)

     Defendants assert that Plaintiff's responsiveness and timeliness failed to improve, and as

a result, Ms. Schuster met with Plaintiff on January 23, 2004, at which time she placed him on a

Performance Improvement Plan ("PIP") and provided him with a Quarterly Review of his job

performance outlining her concerns and expectations going forward.[10] (Id. ¶¶ 11-12; see also

Quarterly Rev., Schuster Aff., Ex. B.)  Plaintiff argues that he was being singled out by Ms.

Schuster, and asserts that none of the white or female managers were given a quarterly review in

January. (Ofoedu Aff. ¶ 14.)  Moreover, Plaintiff alleges that the January quarterly review

purported to evaluate his work for the entire quarter, including the subsequent months of

February and March. (Id. ¶ 15.)  Plaintiff also alleges that Ms. Schuster falsely stated at their

meeting that she had evaluated all other managers. (Id. ¶ 16.)

     As outlined in the Quarterly Review, Ms. Schuster discussed with Plaintiff his failure to

---

[10]    Although Plaintiff denies Defendants' assertions in this regard and claims in his Affidavit that Ms. Schuster never discussed a PIP with him, (Pl.'s Rule 56(a)2 Statement ¶¶ 11-12; Ofoedu Aff. ¶ 16), his denial is contradicted by his testimony at his deposition, where he identified the Quarterly Review of Performance, testified that he received it and that Ms. Schuster provided him with a copy of it, and conceded that it contained a review of his performance. (Ofoedu Dep. I at 216:8-221:17; Ofoedu Dep. II at 43:10-44:18, Nov. 8, 2005.)  The document itself states twice, in bold print, "Performance Improvement Plan."  Plaintiff also admits in his Rule 56(a)1 Statement that he refused to sign the Quarterly Review at his January 23, 2004 meeting with Ms. Schuster and did not read it until it was presented to him at his deposition. (See Pl.'s Rule 56(a)2 Statement ¶ 18.) The fact that Plaintiff refused to read the document when it was presented to him does not change the situation.  As such, Plaintiff's denials of paragraphs 11 and 12, so far as they are predicated on his assertion that he never saw the Quarterly Review of Performance until this litigation, are disregarded.

respond to requests for information or emails in a timely manner, his inability to follow-through on assigned tasks and to meet deadlines, and his inconsistent application of the process associated with physician suspensions. (See Defs.' Rule 56(a)1 Statement ¶ 12-13; Quarterly Rev.)  Defendants allege that Ms. Schuster informed Plaintiff that he would be expected to respond to all requests for information within forty-eight hours of the request and would be expected to comply with deadlines and completion dates. (Defs.' Mem. Supp. 5-6.)  Plaintiff denies having had any such issues. (See Pl.'s Rule 56(a)2 Statement ¶ 13.)

Ms. Schuster also determined that Plaintiff was utilizing an incorrect formula to determine the physician delinquency rate and was not utilizing standard data regarding the number of discharges furnished by the hospital's finance department to determine the delinquency rate. (See Defs.' Rule 56(a)1 Statement ¶ 14.)  Defendants allege that when Ms. Schuster reviewed the previous six months of Plaintiffs' delinquency reports, she found "gross inaccuracies" in the reports, and learned that the formula had been altered in mid-2003 to include an inappropriate and incorrect multiplication factor. (Id. ¶ 15; Schuster Aff. ¶ 9.)  When Ms. Schuster raised these issues with Plaintiff, he could not explain why he changed the formula, how the change occurred, why the multiplication factor had been added to the formula, or why he had not been using the correct data from the finance department. (Schuster Aff. ¶ 9; Ex. B to Schuster Aff.)  Because of this alleged problem, Ms. Schuster decided to manage the process of determining the delinquency information for members of the hospital's medical staff and accordingly, took this responsibility away from Plaintiff. (Schuster Aff. ¶ 10; Ex. B to Schuster Aff.)  She asked Plaintiff to continue to prepare the required suspension letters for delinquent physicians, but told him that she wanted to review any letters before they were sent. (Schuster

Aff. ¶ 10; Ex. B to Schuster Aff.)

Plaintiff, however, contends that this allegation was fabricated by Ms. Schuster in an

effort to deflect attention from the fact that her department was not doing well and notes that she

has not produced one such inaccurate report. (See Pl.'s Rule 56(a)2 Statement ¶¶ 14-15; Ofoedu

Aff. ¶ 51.)  Plaintiff also contends that he did not use incorrect data or an incorrect formula, but

only utilized officially-provided data. (See Pl.'s Rule 56(a)2 Statement ¶ 17.)

Defendants also contend that Plaintiff failed to follow the hospital's procedures for

suspending physicians. (Defs.' Mem. Supp. 7; Schuster Aff. ¶ 11.)  Ms. Schuster found that

Plaintiff continually failed to send suspension notices in a timely manner and that there were

several months in which he failed to send any suspension notices at all. (Schuster Aff. ¶ 11.)

According to Ms. Schuster, this was an inconsistent and arbitrary application of the physician

suspension process. (Id.)  In an effort to improve his performance with regard to the physician

suspension process, Ms. Schuster directed Plaintiff to work with her to learn the proper method

to calculate physician delinquencies and to develop a process to consistently and timely apply the

suspension rules to all physicians. (Id. ¶ 12.)

At their meeting, Plaintiff agreed to attempt to respond to emails within forty-eight hours

and to develop a standardized process for monthly suspensions, (see Ofoedu Dep. I at 218:24-

219:8, Aug. 10, 2005), however, he disagreed with Ms. Schuster's evaluation of his performance

and refused to sign the Quarterly Review. (Schuster Aff. ¶ 13.)  Plaintiff also refused to read the

Quarterly Review until it was presented to him at his deposition. (Defs.' Rule 56(a)2 Statement ¶

18.)

Plaintiff continued to have problems adhering to the physician suspension process, as

evidenced by an event occurring in March 2004.  Ms. Schuster had asked Plaintiff to have

suspension notices prepared and ready for her review on the morning of March 24, 2004.

(Schuster Aff. ¶ 14.)  Ms. Schuster was on vacation on March 24, but came into work in order to

review the suspension notices she had requested. (Id.)  When she arrived at work, the suspension

notices were not available for her review, and she emailed Plaintiff to express her displeasure.

(Id.; see also Ex. C to Schuster Aff.)  Ms. Schuster later learned, however, that Plaintiff had

printed the suspension notices and was mailing them contrary to her instructions. (Schuster Aff. ¶

15.)  Ms. Schuster contacted Plaintiff and told him to stop the mailing process. (Id.)  She

reviewed the notices he had prepared the next day and observed that Plaintiff had prepared the

wrong form letter, and accordingly, the notices had to be prepared again. (Id.)  Plaintiff

acknowledged that he failed to provide the letters for Ms. Schuster's review and that he began

sending them to physicians against her instructions. (Defs.' Rule 56(a)1 Statement ¶ 22.)[11]

    During this period of time, Ms. Schuster became increasingly concerned about Plaintiff's

ability to cooperate and work well with his staff and colleagues both inside and outside the

Medical Records Department.[12] (Id. ¶ 23.)  Defendants cite, as an example, the fact that in

---

[11]    In Plaintiff's deposition, he admitted that Ms. Schuster asked him to put the suspension notices on
the table in her conference room for her review, and that he failed to do so and sent the suspension
letters out without her review.  He acknowledged that doing so was against her instructions, but
testified that "it was an oversight and I apologized to her." (See Ofoedu Dep. I at 243:7-18.)
Although Plaintiff's Affidavit relays a contradictory set of events, it is well-established in the
Second Circuit that "a party may not create material issues of fact by submitting an affidavit in
opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's
previous deposition testimony." Raskin v. Wyatt Co., 125 F.3d 55, 63 (2d Cir. 1997) (citing Hayes
v. New York City Dep't of Corrections, 84 F.3d 614, 619 (2d Cir. 1996)).  Accordingly,
Defendants' version of events—as supported by Plaintiff's deposition testimony—will be credited.

[12]    This problem was identified by Catherine Szenczy as early as September 2002, when she noted in
Plaintiff's annual performance review that although Plaintiff is enthusiastic and hardworking, his
"enthusiasm sometimes leads him to initiate changes that have not been well coordinated with his
peers and his manager. There has also been some tension between [Plaintiff] and one of his

February 2004, Joyce Downey prepared a memorandum detailing the problems she had with

Plaintiff during a meeting organized to discuss ways to improve the performance of the Medical

Records Department. (Id. ¶ 24; see also Downey Mem., Ex. K to Schuster Aff.)[13]  Plaintiff asserts

that his meeting with Ms. Downey on February 24, 2004 was a cordial one, and attaches an email

that he sent to Ms. Schuster that afternoon, which lays out the results of the meeting and does not

suggest any disagreement. (See Ofoedu Aff. ¶ 73; Ofoedu email, Feb. 24, 2004, Ex. R to Pl.'s

Mem. Opp.)  There is also evidence that Ms. Schuster received several complaints from

Plaintiff's staff and other individuals outside the department regarding his lack of cooperation,

rudeness, and "other inappropriate conduct." (Schuster Aff. ¶ 38; Davis Dep. 122:5-18, 126:10-

128:16, Nov. 9, 2005.)

On May 7, 2004, Ms. Schuster met with Plaintiff and Denise Currier, from St. Francis'

human resources department, to discuss Ms. Schuster's concerns about Plaintiff's performance.

(Schuster Aff. ¶ 16.)  Plaintiff was presented with a Final Written Warning at that time, however,

before Ms. Schuster and Ms. Currier could discuss the issues raised in the Final Written Warning

with Plaintiff, he refused to meet with them and left the room. (Id.; see also Final Written

Warning, Ex. D to Schuster Aff.)  Plaintiff did not sign or read the Warning. (Ofoedu Dep. I at

270:19-272:4; see also Final Written Warning.)  In the Warning, Ms. Schuster wrote that

---

colleagues. In addition to his departmental goals, [Plaintiff] needs to improve his professional
relationships with his colleagues and work as part of a team." (2002 Perf. Rev., Ex. 8 to Strange
Aff.)  Ms. Szenczy gave him an overall "quality" rating. (Id.)

[13]     Plaintiff contends that Defendants' assertion that he had problems with Ms. Downey is false, and
points out that the Downey memorandum submitted by Defendants is an unsigned, undated note
with no indication as to its origin. (See Pl.'s Rule 56(a)2 Statement ¶ 24; Ofoedu Aff. ¶ 73.)
Because the memorandum has not been properly authenticated, it is not admissible evidence and
therefore, has no probative value here. See Fed. R. Evid. 901; Fed. R. Civ. P. 56(e); Rohman, 215
F.3d at 218 n.6 (only admissible evidence may be used to support or resist a motion for summary
judgment).

Plaintiff's performance did "not currently meet the expectation [sic] of Departmental Manager and fail[ed] to meet the established World Class Standards." (Final Written Warning.)  As examples of Plaintiff's poor performance, she noted that he had failed to: (1) "follow directions from Director," (2) "respond timely to inquiries from the Director," (3) "plan, organize and complete tasks in the shortest [sic] most efficient manner or on time," (4) "take all positive steps to prevent recurrence of errors," (5) "apply all rules fairly," (6) "effectively handle concurrent assignments," and (7) "promote cooperative behavior within his staff or among the Medical Record Team." (Final Written Warning.)  She also raised two instances of insubordination by Plaintiff. (Final Written Warning.)

The first alleged instance of insubordination raised in the Final Written Warning occurred on March 9, 2004. (Schuster Aff. ¶ 18; Final Written Warning.)  Ms. Schuster, in the process of reviewing prior week's time sheets, discovered that Plaintiff had attempted to manipulate his vacation time by clocking into work shortly after midnight for a few hours and then taking the rest of the day off.  Because he was an exempt employee, Plaintiff's time sheet reflected that he had worked a full day.  As a result, Plaintiff's time sheet for the week prior to March 9 indicated that he worked three days and took two vacation days even though he had taken three vacation days. (Schuster Aff. ¶ 18; Final Written Warning.)  Defendants contend that when Ms. Schuster raised this with Plaintiff, he began to argue with her and told her that he was going to investigate her.  Ms. Schuster immediately notified Ms. Szenczy of her conversation with Plaintiff. (Schuster Aff. ¶ 18; Final Written Warning.)

The second alleged instance of insubordination raised in the Final Written Warning occurred in May 2004 when Plaintiff failed to arrange coverage for a third-shift employee who

14

was on vacation for a two-week period beginning on May 9, 2004. (Schuster Aff. ¶ 19; Final Written Warning.)  Although Plaintiff had approved the employee's vacation request in March 2004, he had failed to arrange coverage for the shifts.[14] (Schuster Aff. ¶ 19; Final Written Warning.)  Plaintiff told Ms. Schuster a number of times that his department should be closed because he could not find the necessary personnel to provide the coverage, however, Ms. Schuster told him that this was not an option. (Schuster Aff. ¶ 19; Final Written Warning.)  In May 2004 Plaintiff had still not found staff to cover the missing shifts and according to Defendants, attempted to force Paulette Moore, a part-time employee, to cover the shifts, which caused her to resign from her position. (Schuster Aff. ¶ 19; Final Written Warning.)  Ms. Schuster repeatedly told Plaintiff that he could not require a part-time employee to cover extra shifts and that if he could not find staff to do so, then he would have to cover the shift himself. Plaintiff, however, refused to do so, telling Ms. Schuster that he had already "paid his dues." (Schuster Aff. ¶ 20; Final Written Warning.)  Before the situation was resolved, Plaintiff commenced a medical leave of absence for "stress" on May 10, 2004, as discussed below. (Schuster Aff. ¶ 21; Ofoedu Dep. I at 291:14-292:17)

Defendants assert that another instance of insubordination—not raised in the Final Written Warning—occurred when Plaintiff was asked to attend a meeting with the gastro-intestinal physicians at 6:30 a.m. on the morning of March 30, 2004 to discuss the untimely delivery of physician reports to doctors who had referred patients to the gasto-intestinal service for diagnostic tests.  Defendants assert that Plaintiff refused to attend the meeting, and Ms.

---

[14]     Defendants contend, and Plaintiff does not dispute, that Plaintiff was responsible for provided adequate staffing for his section of the Medical Records Department. (Defs.' Mem. Supp. 10.)

Schuster had to attend in his place. (Schuster Aff. ¶ 23.)[15]  Plaintiff asserts that he was not

supposed to be on duty at 6:30 a.m. and that Ms. Schuster had elected to attend the meeting

herself rather than approve overtime pay for Plaintiff. (Pl.'s Rule 56(a)2 Statement ¶ 28.)

      Plaintiff complained to Catherine Szenczy, Senior Vice President and Chief Information

Officer and Ms. Schuster's immediate supervisor, in March 2004 that Ms. Schuster's

performance expectations were too demanding and alleged that Ms. Schuster had altered his time

sheets.[16] (Defs.' Rule 56(a)1 Statement ¶ 46; see also Ofoedu Dep. I at 256:4-258:20.)  Plaintiff

also claimed, in his deposition, that he wrote an email to Ms. Szenczy complaining that he was

being treated unequally. (See Ofoedu Dep. I at 258:8-20.)  In an unsigned, undated document

entitled "Memo to Catherine," attached as Plaintiff's Exhibit V, Plaintiff complains to Ms.

Szenczy about his "frustrations," and the "inconsistencies and clandestine approaches and

selective applications of the hospital policies and procedures by [Ms. Schuster] toward [him] for

more than seven months . . . ." (See Ofoedu Memo. to Szenczy, Ex. V to Pl.'s Mem. Opp.)  He

writes that Ms. Schuster "is overwhelming with work demands and deadlines that are clearly

impossible to accomplish; all with a purpose of proving to herself that I am 'incompetent' to do

my job." (Id.)  He discusses a number of examples of her "unreasonable demands."  For example,

Plaintiff writes:

> By routinely including me in weekend activities she is purposely creating hardship
> in my personal life, because, as she knows, I spend the weekends with family in

---

[15]    Defendants attach a note written by Ms. Schuster with regard to the March 30, 2004 meeting.  In that note, she wrote that Plaintiff refused to attend the meeting and was "unable to provide an acceptable reason."  She notes that she attended the meeting in his absence. (Ex. E to Schuster Aff.)

[16]    The parties do not dispute that Plaintiff complained to Ms. Szenczy, but they disagree as to whether the Complaint was oral or in writing, and as to the substance of the Complaint.

Boston.  Besides, no other manager in the department is subjected to this type of abuse.

(Id.)  Plaintiff also emphasizes, both in the memo and in his Rule 56(a)2 Statement, the following incident:

> As a credentialed staff, I need specific number of CEU's every two years to keep my accreditation.  On May 2 and 3, there was a seminar in Connecticut which I applied for and was denied by Carol.  The reasons that she gave me were that "the topics of the seminar are not related to your area." . . . I even offered to pay for it myself, and she adamantly refused, saying "can you afford to leave your areas?"  I was appalled by this statement.

(Id.)  Plaintiff concludes by saying that "I am not quitting. . . . All I am asking is to be treated fairly by my supervisor, and for her to stop this harassment." (Id.)

On May 10, 2004, Ms. Schuster met with Plaintiff and provided him with a memorandum in which she outlined three assignments that were overdue and one that was due to her by May 12, 2004. (Schuster Aff. ¶ 23; Ex. F to Schuster Aff.)  Ms. Schuster also outlined several deficiencies in Plaintiff's performance—i.e., a backlog in analysis of inpatient records and persistent delays in the filing of transcribed reports—and asked Plaintiff to provide her with a plan for addressing those issues. (Schuster Aff. ¶ 23; Ex. F to Schuster Aff.)  On that same day, Plaintiff began a medical leave of absence for "stress." (Schuster Aff. ¶¶ 21, 24; Ofoedu Dep. I at 292:2-17)

Ms. Schuster believed that Plaintiff's areas of responsibility had continued to decline from acceptable standards. (Schuster Aff. ¶ 25; Ex. F to Schuster Aff.)  Specifically, Ms. Schuster determined that Plaintiff was well below the required performance standard in two

17

areas: (1) the analysis of inpatient record completion[17] and (2) the analysis of one-day stay and ambulatory surgery record completion.[18] (Schuster Aff. ¶ 25; Ex. F to Schuster Aff.)  Plaintiff contends that there was no backlog in the analysis of inpatient records, see Ofoedu Affidavit at paragraph 67, and argues that Ms. Schuster's assertions are "merely baseless allegation [sic]."[19] (Pl.'s Rule 56(a)2 Statement ¶ 31.)

Faye Davis assisted Ms. Schuster in managing the areas that Ms. Schuster was concerned about during Plaintiff's leave of absence. (Schuster Aff. ¶ 28.)  In this role, Ms. Davis coordinated the work and developed and implemented a plan that brought the department's performance back within acceptable standards. (Id.)  As a result, Ms. Schuster placed Ms. Davis in charge of these areas and removed them from Plaintiff's duties. (Id.)  Plaintiff, however, contends that while he was out on leave, Ms. Schuster hired two new file clerks, approved overtime pay for all file clerks, and abandoned the "shelf audit" that Plaintiff had been required to conduct. (See Pl.'s Rule 56(a)2 Statement ¶ 32; Ofoedu Aff. ¶ 68.)  Plaintiff asserts that all of this is evidence that Ms. Schuster "deliberately provided [him] with less than adequate materials

---

[17]     The departmental performance standards require that medical records for inpatients be made available for physicians to complete their charting and for signature within five days of the patient's discharge from the hospital, however, as of May 10, 2004, Ms. Schuster determined that eighty-three percent of the medical records of discharged patients did not meet this standard. (Schuster Aff. ¶ 26; Ex. F to Schuster Aff.)

[18]     The departmental performance standards require that medical records for patients at the hospital for a one-day stay or for ambulatory surgery ("ODAs") be made available for physicians to complete their charting and for signature within seven days of the patient's discharge from the hospital, however, as of May 10, 2004, Ms. Schuster determined that eighty-nine percent of the medical records of discharged patients did not meet this standard.  Ms. Schuster estimated the backlog for ODAs to be approximately sixty-seven days. (Schuster Aff. ¶ 27; Ex. F to Schuster Aff.)

[19]     Plaintiff denies Defendants' assertions regarding Ms. Schuster's conclusions in paragraph 31 of his Rule 56(a)2 Statement, however, his denial is not based on personal knowledge.  He cannot properly deny her observations / conclusions.  As such, Defendants' assertions regarding Ms. Schuster's observations and conclusions are deemed admitted.

to execute his functions." (Pl.'s Rule 56(a)2 Statement ¶ 32.)

Plaintiff returned to work on or about May 25, 2004. (Schuster Aff. ¶ 29.)  Upon Plaintiff's return to work, Ms. Schuster announced a restructuring of the Medical Records Department. (Schuster Aff. ¶ 32.)  Ms. Davis was promoted to the position of Assistant Director, and assumed greater responsibility for the day-to-day managerial operations of the department and continued to perform her prior responsibilities, which included overseeing coding. (Id.) According to Defendants, Ms. Schuster did not consider Plaintiff for the Assistant Director position due to his past performance problems, his PIP,[20] and her own observations of his job performance. (Schuster Aff. ¶ 33.)  Ms. Schuster asserts that in her opinion, Ms. Davis was a better performer than Plaintiff was, she had been employed with St. Francis for over twenty years and thus had more experience than Plaintiff in the Medical Records Department, and had outstanding performance evaluations throughout her employment with St. Francis. (Id. ¶ 33.) Plaintiff contends that he had no performance problems and asserts that it was contrary to St. Francis policy to create a new position and fill it without advertising it first. (Pl.'s Rule 56(a)2 Statement ¶ 37.)  Plaintiff, however, provides no evidence in support of his claim that St. Francis requires all open positions to be posted and there is evidence contradicting his claim. (See Currier Dep. 66:16-21, Nov. 7, 2005)  Plaintiff also asserts that he was more qualified than Ms. Davis and that Ms. Davis was not qualified for the position in question. (Pl.'s Statement of Disputed Issues ¶ 10.)

Upon Plaintiff's return to work, Ms. Schuster reviewed the work assignment

---

[20]    According to Ms. Schuster, St. Francis policy does not permit an employee to be promoted while on a PIP. (Schuster Aff. ¶ 33.)

memorandum with him and adjusted and reviewed his assignments and deadlines. (Schuster Aff. ¶ 29.)  Specifically, Ms. Schuster extended several deadlines and notified Plaintiff that she had reassigned some of his duties to Ms. Davis. (Id.)  She again discussed with Plaintiff the delay in the filing of transcribed reports and gave him a revised deadline of June 9, 2004 to provide her with a plan to address this issue. (Id.)  Ms. Schuster also extended Plaintiff's deadline for providing her with a revised plan to conduct a shelf audit of the files in the Medical Records Department to June 9, 2004. (Id.)  Plaintiff admits these facts, but contends that the only duty left for him upon his return to work was "managing transcriptionists." (Pl.'s Rule 56(a)2 Statement ¶ 34.)

Another incident occurred on May 13, 2004, when Ms. Schuster was working with a clerk in the Medical Records Department and noticed that the clerk entered Plaintiff's username and password in order to access an online database containing confidential patient care information. (Schuster Aff. ¶ 30.)  When Ms. Schuster inquired about the username and password, the clerk responded that Plaintiff had given her and several other individuals his username and password so that they could access the system, even though several of the individuals had not been trained on the system and were not authorized to access confidential information. (Id.)  Ms. Schuster concluded that Plaintiff's conduct in this regard violated the HIPAA privacy requirements and counseled him about the matter and provided him with a Progressive Discipline Action Form at their May 25, 2004 meeting. (Id.; Defs.' Rule 56(a)1 Statement ¶ 35.)

Ms. Schuster met with Plaintiff again on June 3, 2004 and reviewed the expectations they had discussed on May 25, 2004. (Schuster Aff. ¶ 34.)  She outlined Plaintiff's remaining

responsibilities,[21] discussed the outstanding tasks which he needed to address, and reviewed other deficiencies existing in his section of the department. (Id.; see also Ex. J to Schuster Aff.)  As discussed above, Plaintiff was required to submit a plan to improve the timeliness of filing transcribed reports to Ms. Schuster by June 9, 2004, however, Plaintiff did not produce the document until June 11, 2004. (Schuster Aff. ¶ 35.)  Plaintiff failed to inform Ms. Schuster that the plan would be late or request additional time to complete it. (Id.)  Plaintiff was also required to provide Ms. Schuster with a plan to conduct a shelf audit of medical records files by June 9, 2004, however, he failed to do so. (Id.)

According to Defendants, as discussed with Plaintiff at his June 3, 2004 meeting with Ms. Schuster and as set forth in her memorandum of that date, Plaintiff was expected to inform Ms. Schuster or Ms. Davis of any communications with physicians regarding the suspension process. (Id. ¶ 36; see also Ex. J to Schuster Aff. ("All physician inquiries [regarding suspension notification letters] must be referred to myself or Faye [Davis].").)  On June 9, 2004, Dr. Patrick Corcoran was scheduled to be added to the suspension list if he did not complete his records by 5:00 p.m. that day, however, Plaintiff had received an email from Dr. Ronald Burt, Chief of Staff, at 3:55 p.m. that day requesting that Dr. Corcoran not be suspended because he had just returned from vacation. (Schuster Aff. ¶ 37.)  Plaintiff did not notify Ms. Schuster or Ms. Davis of Dr. Burt's email, which Ms. Schuster learned about from Dr. Burt later that day. (Id.) Defendants contend that Plaintiff's failure to communicate this information was a direct violation of Ms. Schuster's instructions to him. (Id.)  Plaintiff asserts, however, that he had not accessed

---

[21] According to Defendants, Plaintiff's remaining duties included, *inter alia*, the Millennium database and the management of transcriptionists and transcription services. (Defs.' Mem. Supp. 15.)

his email that day because he had been too busy with other work. (Ofoedu Aff. ¶ 78.)  When Ms.

Schuster asked Plaintiff, at around 5:00 p.m. that day, why she had not been informed of the

email, he asserts that he replied that Dr. Burt had not contacted him, honestly believing it to be

true. (Id.)  Plaintiff claims that it was only then that he checked his email and discovered the

email from Dr. Burt. (Id.)

Ms. Schuster decided, after consulting with St. Francis' human resources department, to

terminate Plaintiff's employment. (Schuster Aff. ¶ 39.)  Ms. Schuster and Ms. Currier met with

Plaintiff on June 15, 2005 and notified him that his employment with St. Francis was terminated.

(Id. ¶ 40.)

Plaintiff alleges that during his tenure at St. Francis, he received "commendations" from

the Chief Executive Officer of the hospital, Dr. David D'Eramo.  As an example, Plaintiff

discusses a January 27, 2004 management meeting conducted by Ms. Schuster, after which he

claims that Dr. D'Eramo "singled [him] out for commendation and stated to all present that from

information reaching him, [Plaintiff is] a good example of commitment to one's chosen career

and family." (Ofoedu Aff. ¶ 10.)

Plaintiff also claims that he was a non-exempt employee, and as such, was entitled to

receive overtime pay for all hours worked over forty hours in a work week. (See Pl.'s Statement

of Disputed Issues ¶¶ 6, 24; St. Francis Employee Handbook at 13, Ex. F to Pl.'s Mem. Opp.)

Plaintiff claims that he worked a "minimum" of sixty-five hours per week in a typical work week

without receiving overtime pay, however, the only time sheet he attached in support of this claim

is for a week in which he worked only thirty-two hours. (See Pl.'s Statement of Disputed Issues

¶¶ 6, 24; Mar. 7, 2004 Ofoedu Time Sheet, Ex. B to Pl.'s Mem. Opp.)  Plaintiff also notes that

22

female managers in the department were given pay raises, alleging that Joyce Downey was given

a pay raise from grade 16 to grade 20 on April 15, 2004, and that Faye Davis was given a pay

raise from grade 17 to grade 20 on April 4, 2004, and a pay raise from $36.06 per hour to $40.86

per hour on May 9, 2004.[22] (See Pl.'s Statement of Disputed Issues ¶¶ 19, 20; Exs. T & U to Pl.'s

Mem. Opp.)

On June 17, 2004, Plaintiff filed an administrative charge with the Equal Employment

Opportunity Commission ("EEOC"), alleging that he was terminated from St. Francis based on

his sex (male) and national origin (Nigerian).  Plaintiff also claimed that he was retaliated against

for complaining to his supervisor.  St. Francis filed a response to Plaintiff's administrative charge

and on June 12, 2004, the EEOC issued a finding of no probable cause and dismissed Plaintiff's

administrative charge.  The EEOC then issued its Dismissal and Notice of Rights, permitting

Plaintiff to pursue his claims in federal court.  Plaintiff filed the Complaint in this action on

October 12, 2004, alleging violations of Title VII and 42 U.S.C. § 1981.

**B.      Standard of Review**

Summary judgment is appropriate only when "the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law."  Fed. R. Civ. P. 56(c).  No genuine issue of material fact exists and summary

judgment is therefore appropriate when "the record taken as a whole could not lead a rational

trier of fact to find for the non-moving party."  Matsushita Elec. Indus. Co. v. Zenith Radio

---

[22]      Ms. Davis' second pay raise was implemented as part of her promotion to from Manager to
Assistant Director of the Medical Records Department in May of 2004. (See Ex. U to Pl.'s Mem.
Opp.)

23

Corp., 475 U.S. 574, 587 69, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)).  A material fact is one

which "might affect the outcome of the suit under the governing law" and an issue is genuine

when "the evidence is such that a reasonable jury could return a verdict for the nonmoving

party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202

(1986)).  Importantly, however, "[c]onclusory allegations will not suffice to create a genuine

issue." Delaware & H. R. Co. v. Conrail, 902 F.2d 174, 178 (2d Cir. 1990).

 The moving party bears the burden of establishing that summary judgment is appropriate,

Anderson, 477 U.S. at 255, and the court should "draw all factual inferences in favor of the party

against whom summary judgment is sought, viewing the factual assertions in materials such as

affidavits, exhibits, and depositions in the light most favorable to the party opposing the motion."

Rodriguez v. City of N.Y., 72 F.3d 1051, 1060 (2d Cir. 1995) (citations omitted).

Determinations of the weight to accord evidence or assessments of the credibility of witnesses

are improper on a motion for summary judgment as such are within the sole province of the jury.

Hayes v. N.Y. City Dep't of Corr., 84 F.3d 614, 619 (2d Cir. 1996).  "If reasonable minds could

differ as to the import of the evidence . . . and if . . . there is any evidence in the record from any

source from which a reasonable inference in the nonmoving party's favor may be drawn, the

moving party simply cannot obtain a summary judgment."  R.B. Ventures, Ltd. v. Shane, 112

F.3d 54, 59 (2d Cir. 1997) (internal citations omitted); see also Sologub v. City of New York,

202 F.3d 175, 178 (2d Cir. 2000) ("When reasonable persons applying the proper legal standards

could differ in their responses to the questions raised on the basis of the evidence presented, the

question is best left to the jury.").

 "At summary judgment in an employment discrimination case, a court should examine

the record as a whole, just as a jury would, to determine whether a jury could reasonably find an invidious discriminatory purpose on the part of an employer." Byrnie v. Town of Cromwell, Board of Education, 243 F.3d 93, 102 (2d Cir. 2001). Although caution must be exercised before granting summary judgment to an employer in an employment discrimination case where discriminatory intent and state of mind are in dispute, see Carlton v. Mystic Transp., Inc., 202 F.3d 129, 134 (2d Cir. 2000), the Second Circuit has said that "summary judgment may be appropriate even in the fact-intensive context of discrimination cases," as "[t]he salutary purposes of summary judgment—avoiding protracted, expensive and harassing trials—apply no less to discrimination cases than to . . . other areas of litigation." Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 466 (2d Cir. 2001) (citing Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985)).

### C.  Discussion

#### 1.  Plaintiff's Claims of Race, Gender, and National Origin Discrimination

Plaintiff claims that he was discriminated against on the basis of his gender and national origin in violation of Title VII, and on the basis of his race in violation of 42 U.S.C. § 1981.[23] Claims of employment discrimination brought under both Title VII and Section 1981 are governed by the evidentiary burden-shifting framework set out in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). See Patterson v. County of Oneida, 375 F.3d 206, 225 (2d Cir. 2004); Pierce v. Netzel, 148 Fed. Appx. 47, 49 (2d Cir.

---

[23]     Section 1981 prohibits discrimination on the basis of race, providing that: "[a]ll persons . . . shall have the same right . . . to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other." 42 U.S.C. § 1981(a).

25

2005).

In order to survive a motion for summary judgment, a plaintiff must first make a prima facie case of discrimination by presenting evidence sufficient to create an inference that the employer's decision was based on an illegally discriminatory criterion. Int'l Bhd. of Teamsters v. United States, 431 U.S. 324, 358, 97 S. Ct. 1843, 52 L. Ed. 2d 396 (1977). If the plaintiff is able to make out a prima facie case of discrimination, the burden then shifts to the defendant to establish a legitimate, nondiscriminatory business reason for its action. See Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981). Although the McDonnell Douglas framework places the burden on the defendant of producing an explanation to rebut the plaintiff's prima facie case, it is important to remember that the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated on the basis of an impermissible factor remains at all times with the plaintiff.[24] Burdine, 450 U.S. at 253. If the employer succeeds in articulating such a reason, the presumption of discrimination arising from the establishment of the prima facie case "drops from the picture" and the burden shifts back to the plaintiff to show both that the employer's proffered reason was merely a pretext for impermissible discrimination and that the plaintiff's race, national origin, and/or gender was the actual motivating factor. See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 510-11, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993); Abdu-Brisson, 239 F.3d at 459.

        a.    *Plaintiff's Prima Facie Case*

---

[24] The presumption operates, in this regard, like all other presumptions, as described in Federal Rule of Evidence 301: "In all civil actions and proceedings . . . a presumption imposes on the party against whom it is directed the burden of going forward with evidence to rebut or meet the presumption, but does not shift to such party the burden of proof in the sense of the risk of nonpersuasion, which remains throughout the trial upon the party on whom it was originally cast."

To make out a prima facie case of employment discrimination under Title VII, Plaintiff must show that (1) he is a member of a protected class; (2) he is qualified for the job; (3) he suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of discrimination.  Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 142, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000); Fisher v. Vassar Coll., 114 F.3d 1332, 1335 (2d Cir.) (en banc), cert. denied, 522 U.S. 1075, 118 S. Ct. 851, 139 L. Ed. 2d 752 (1998); Stern v. Trustees of Columbia Univ., 131 F.3d 305, 311-12 (2d Cir. 1997); Shumway v. United Parcel Serv., 118 F.3d 60, 64 (2d Cir. 1997).  Plaintiff's burden at this stage is not an onerous one; he merely has to present facts sufficient to give rise to a presumption of discrimination.  See Burdine, 450 U.S. at 254; Abdu-Brisson, 239 F.3d at 467 ("A plaintiff's burden of establishing a prima facie case is de minimis.").

To prevail on his § 1981 claim of racial discrimination, Plaintiff must also prove that (1) Defendants intentionally discriminated against him, i.e., that they discriminated against him because of his race and (2) the discrimination concerned one of the statute's enumerated activities, including "to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property."[25] 42 U.S.C. § 1981; Brown v. City of Oneonta, 221 F.3d 329, 339 (2d Cir. 2000); Mian v. Donaldson, Lufkin & Jenrette Sec. Corp., 7 F.3d 1085, 1087 (2d Cir. 1993); see also Calderon v. Dinan & Dinan PC, No. 3:05cv1341 (JBA), 2006 U.S. Dist. LEXIS 39024, *10-11 (D. Conn. June 14, 2006).

---

[25]    For purposes of section 1981, the term "make and enforce contracts" includes "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b).

27

Defendants do not dispute that Plaintiff has met the first three prongs of his prima facie case and accordingly, only the fourth prong will be addressed here.  Defendants argue that Plaintiff cannot, under the fourth prong of the analysis, show that his employment contract was terminated under circumstances giving rise to an inference of discriminatory intent. (See Defs.' Mem. Supp. 22-26.)

No one particular type of proof is required to show that Plaintiff's termination occurred under circumstances giving rise to an inference of discrimination. See Abdu-Brisson, 239 F.3d at 466-68; Burdine, 450 U.S. at 253-54 & n.6; McDonnell Douglas, 411 U.S. at 802 n.13.  Plaintiff could show that Defendants "subjected him to disparate treatment, that is, treated him less favorably than a similarly situated employee outside his protected group." Graham v. Long Island R.R., 230 F.3d 34, 38-40 (2d Cir. 2000).  A showing of disparate treatment is not the only way to establish an inference of discriminatory intent; such an inference can be drawn in other circumstances as well, including, *inter alia*:

> the employer's continuing, after discharging the plaintiff, to seek applicants from persons of the plaintiff's qualifications to fill that position; or the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge.

Abdu-Brisson, 239 F.3d at 468 (quoting Chambers v. TRM Copy Ctr. Corp., 43 F.3d 29, 37 (2d Cir. 1994)).

Plaintiff argues that there were a number of factors that gave rise to an inference of discriminatory intent.  Specifically, he asserts that the fact that Ms. Schuster created a position of Assistant Director and filled the position without advertising the opening is evidence of

discriminatory intent. (Pl.'s Mem. Opp. 10.)  Plaintiff believes that Ms. Schuster wanted to make

sure that Plaintiff was excluded from applying for the position. (Id.)  Plaintiff, however, provides

no evidence in support of his claim that St. Francis requires all open positions to be posted and

there is evidence contradicting his claim. (See Currier Dep. 66:16-21, Nov. 7, 2005 (testifying

that there is no requirement that a position be posted before it is filled).) Moreover, Plaintiff

provides no evidence in support of his assertion that Ms. Schuster intended to exclude him from

applying for the position.  To the extent that Plaintiff was denied the ability to apply for the

position because it was not posted, so too were the white, female, American managers in

Plaintiff's department. (Pl.'s Disputed Issues of Material Fact ¶ 9.)

     Plaintiff also argues that the fact that his complaint to Ms. Szenzcy was never

investigated gives rise to an inference of discriminatory intent. (Pl.'s Mem. Opp. 10.)  According

to both Plaintiff and Defendants, however, Ms. Szenczy denied ever receiving his complaint, and

Plaintiff provides no evidence that the document was ever sent by him or received by Ms.

Szenczy.  The human resources department did not have the complaint on file, and Ms. Currier

denied any knowledge of the complaint. (See id. at 10-11 (citing Currier Dep. 76-80).)

Defendants assert that Plaintiff failed to disclose this document in response to Defendants' First

Set of Requests for Production. (Defs.' Reply II at 7 n.4.)  Plaintiff did produce the document at

the deposition of Ms. Szenczy, however, Defendants claim that they did not possess the

document at that time and had not seen it prior to Ms. Szenczy's deposition. (Id.)  In his

Opposition brief, Plaintiff does not address his failure to produce this document initially or to

testify to this memorandum at his deposition.  Plaintiff cannot argue that the failure to investigate

his complaint was discriminatory when there is no evidence that Defendants had any knowledge

of the complaint. See Shumway, 118 F.3d at 64-65 (holding that "[i]t is impossible to demonstrate that [the employer] treated similarly situated [non-protected employees] differently" when the plaintiff had presented no evidence that the employer had knowledge of any other violations of the rule that the plaintiff was terminated for violating).

Finally, Plaintiff claims that upon his termination, he was "hastily replaced" with a woman. (Pl.'s Mem. Opp. 11.)  A prima facie case may, in some cases, be established if the plaintiff can show that after he was terminated, his position was filled by a person outside of his protected class. See McDonnell Douglas (finding an inference of discrimination when a qualified black applicant was rejected and the employer continued to seek applicants with no better qualifications); Burdine, 450 U.S. at 254 n.6 (finding an inference of discrimination where a qualified woman was rejected and after several months, the position was filled by a male who had been under her supervision); Schnabel v. Abramson, 232 F.3d 83, 87 (2000) (finding an inference of age discrimination when the plaintiff was fired and replaced by a younger person). Plaintiff, however, presents no evidence in support of this claim.[26]  Moreover, the fact that the position was filled by a person outside of the plaintiff's protected class will not suffice in every situation to establish a prima facie case; the Court must examine the precise facts in each case, rather than just conducting a rote repetition of the four factors, to determine whether a prima facie case, sufficient to support an inference of discrimination and thus to permit a finding of liability, has been presented. Fisher, 114 F.3d at 1367.  Even if the Court was to credit Plaintiff's assertion in this regard and find that he has made his prima facie case, he has not presented

---

[26]   Plaintiff makes this claim for the first time in his Opposition Brief.  He did not make this claim in his deposition or his Affidavit, and presents no other evidence to support his assertion.  He also fails to identify the woman who allegedly replaced him.

sufficient evidence of pretext, as discussed below.

> b.     *Defendant's Legitimate, Nondiscriminatory Reasons for Termination*

Defendants, asserting that Plaintiff was terminated due to his poor job performance and his failure to improve, have met their burden of articulating a legitimate, non-discriminatory reason for Plaintiff's termination.  They have presented evidence showing that Plaintiff's performance was substandard.  Specifically, Defendants have provided documentation consisting of Plaintiff's work evaluations, his PIP, the Quarterly Review of his job performance, the Final Written Warning, Ms. Schuster's May 10, 2004 and June 3, 2004 memoranda to Plaintiff, and Ms. Schuster's notes of her February 24, 2004 meeting with Plaintiff.  The memoranda and evaluations submitted by Defendants detail a long list of issues with Plaintiff's performance, including, *inter alia*, his lack of consideration for and problems working well with staff and colleagues, his inability to deliver timely responses to requests for information, his use of an incorrect formula and data for calculating physician delinquency rates, his failure to follow hospital procedures for suspending physicians, the fact that he mailed suspension notices contrary to Ms. Schuster's instructions, his failure to arrange coverage for a third-shift employee who was on vacation, his refusal to attend a morning meeting, his overdue assignments, the backlog in his analysis of inpatient records, and his persistent delays in filing transcribed reports. The evidence submitted by Defendants amply supports their proffered race-neutral reason for discharging Plaintiff, namely, his failure to perform his job to their satisfaction and his failure to improve after repeated warnings and reviews.  The submission of evaluations of Plaintiff's performance, memoranda, and the written warnings constitutes permissible support for

Defendants' proffered explanation. See Meiri v. Dacon, 759 F.2d 989, 995 (2d Cir. 1985) ("In determining whether an employee's job performance is satisfactory, courts may—as they often must—rely on the evaluations rendered by supervisors.").

c.    <em>Plaintiff's Evidence of Pretext</em>

i.    Pretext

Even if Plaintiff had been able to establish a prima facie case,[27] he is unable to defeat summary judgment.  Because Defendants have met their burden, the burden shifts back to Plaintiff to come forward with evidence that Defendants' proffered legitimate, nondiscriminatory reason is pretextual, thus supporting an inference that the true reason for Plaintiff's termination was discriminatory.  To establish pretext, Plaintiff must show either that "a discriminatory reason more likely motivated the employer or . . . that the employer's proffered explanation is unworthy of credence." Burdine, 450 U.S. at 256.

In this case, Plaintiff has presented no evidence that would lead a reasonable jury to conclude that Defendants' proffered reason for his termination is pretextual or that Defendants discriminated against him.  Although Plaintiff alleges that Ms. Schuster's performance requirements were too demanding—claiming that she set deadlines that were designed to ensure that Plaintiff's performance would be unsatisfactory, failed to provide him with sufficient support staff, and tried to make him work on weekends when he was unavailable—he presents no evidence in support of his claims.  Notably, there is no evidence as to what "normal" requirements and expectations associated with Plaintiff's job should have been, and no specific

---

[27]    The Court assumes, *arguendo*, that Plaintiff has met his prima facie case.  The evidence presented, however, is not sufficient for the Court to find that Plaintiff has done so.

factual basis for his conclusory claim that Ms. Schuster created performance requirements designed to ensure that his performance was unsatisfactory.  The evidence presented shows that Plaintiff was initially able to meet his employer's expectations.  Plaintiff received an overall "quality" rating from Ms. Schuster in his work evaluation for the period of August 1, 2003 through September 30, 2003, (see Ex. A to Schuster Aff.), and a "quality" rating from Ms. Szenczy in his work evaluation dated September 19, 2002, (see Ex. 8 to Strange Aff.).  The problems that Ms. Schuster had with Plaintiff's work continued even after she decreased his responsibilities in May 2004.

Plaintiff also points to the two work evaluations in evidence as raising a disputed issue of fact regarding the legitimacy of Defendants' explanation for his termination.  The fact that Plaintiff received prior positive evaluations cannot, in itself, demonstrate that his later negative evaluations, and the concomitant proffered explanation, are unworthy of credence. See, e.g., Billet v. CIGNA Corp., 940 F.2d 812, 826 (3d Cir. 1991) ("Prior good evaluations alone cannot establish that later unsatisfactory evaluations are pretextual"); Jensen v. Garlock, Inc., 4 F. Supp. 2d 219, 223 (W.D.N.Y. 1998) ("While a lengthy period of satisfactory performance may raise an inference of discrimination for purposes of establishing a prima facie case, by itself, such a factor is insufficient to suggest that an employer's amply supported reasons for terminating an employee are pretextual.").  Moreover, even drawing all inferences in Plaintiff's favor, the evaluations—even though they assigned Plaintiff an overall "quality" rating—cannot be considered perfect, or "glowing," reviews.  Both evaluations recognized some of the same problems that were later identified as grounds for Plaintiff's termination.  For example, in his work evaluation for the period of August 1, 2003 through September 30, 2003, Ms. Schuster

raised concerns about Plaintiff's failure to meet deadlines, writing:

> As a new manager within the Department, [Plaintiff] has worked hard to make significant improvements within his sections.  He is making progress, but still has opportunities for improvement.  During the next year, I would like to see [Plaintiff] be more considerate of the department as a whole.  I encourage him to work more closely with his peers and seek additional support from myself. [Plaintiff] is often late when assigned tasks and sometimes struggles with producing the desired outcomes.  He should strive to be more timely and seek further explanation if the instructions are not clear.

(Ex. A to Schuster Aff.)  Moreover, in his evaluation dated September 19, 2002, Ms. Szenczy wrote that Plaintiff "sometimes . . . initiate[s] changes that have not been well coordinated with his peers and his manager," and notes that "[t]here has also been some tension between [Plaintiff] and one of colleagues." (Ex. 8 to Strange Aff.)  Her evaluation concludes by saying, "[i]n addition to the departmental goals, [Plaintiff] needs to improve his professional relationships with his colleagues and work as part of a team." (Id.)  Finally, Plaintiff's "quality" rating was the third level on a scale of one to five, ranging from "unacceptable" to "role model."  These "average" performance reviews, combined with the reviewers' stated concerns about Plaintiff's performance and ability to work well with other members of the department, are not sufficient to raise an issue of fact with regard to the legitimacy of Defendants' proffered explanation for Plaintiff's termination.  The suggestion that Plaintiff was a borderline performer for some time does not go to show that Defendants' reason for his termination is pretextual or that his termination was discriminatory.

The majority of Plaintiff's arguments with regard to pretext are his own opinions of his qualifications and performance, and his disagreement with Defendants' assessment of his performance.  Plaintiff's personal disagreement with Ms. Schuster's evaluation of his skills and

job performance are insufficient, as a matter of law, to preclude summary judgment. See Byrnie, 73 F. Supp. 2d at 214 (finding that the plaintiff's own opinions, offered through affidavit and deposition testimony, about his qualifications "fall short of establishing a dispute about the genuineness of the [defendant's] assessment of his qualifications") (citing Bullington v. United Air Lines, Inc., 186 F.3d 1301, 1317 (10th Cir. 1999) (holding that the plaintiff's "own opinions about her qualifications d[id] not give rise to a material fact dispute"). Plaintiff also presents, however, the deposition testimony of Garfield Gordon, a fellow employee in the Medical Records Department at St. Francis. He painted a slightly different picture of Plaintiff's behavior in the department, asserting that Plaintiff was "very cordial to everyone he associates himself with," "very knowledgeable in the area he was responsible for," and "a very nice person." (Gordon Dep. 18:21-19:3.) He testified that, from what he observed, Plaintiff was "[v]ery friendly" when he interacted with doctors, was not insubordinate, and was not argumentative. (Id. 19:4-12.) The fact that one employee had a different view of Plaintiff's personality and conduct, however, is not sufficient to create an issue of fact as to whether Defendants' proffered explanation for his termination was pretextual. At most, Plaintiff has shown that Mr. Gordon and Ms. Schuster may have had a difference of opinion with regard to Plaintiff's conduct. There is no evidence, however, that Ms. Schuster's, Ms. Szenczy's, and/or the other employees' negative views of Plaintiff's personality and performance came from a discriminatory animus. A difference of opinion is not a legitimate basis for a finding of discrimination.

Plaintiff's attempt to rebut Defendant's proffered explanation by detailing certain incidents, disputing Ms. Schuster's assessments, and providing his own contrary appraisal of his work and the situations at issue, is also unavailing. Plaintiff's affidavit and memorandum in

opposition to summary judgment may raise issues concerning the reasons why he failed to perform his job—e.g., why he failed to respond to Dr. Burt's email, whether he actually had problems with other employees, why physician delinquency rates were not being calculated properly, or why he was not meeting deadlines.  This evidence, however, does not raise an issue of fact regarding the overall legitimacy of Defendant's proffered explanation.

Plaintiff does not dispute that these incidents actually occurred and even if he can show that Defendant's criticism of him was undeserved, "faulting others for, or otherwise rationalizing, problems legitimately perceived by [his] employer does not establish pretext." Taylor v. Polygram Records, No. 94 Civ. 7689 (CSH), 1999 U.S. Dist. LEXIS 2583, *27 (S.D.N.Y. Mar. 5, 1999) (citing McLee v. Chrysler Corp., 109 F.3d 130, 135 (2d Cir. 1997) (plaintiff's rationalizations for his deficiencies did not serve to demonstrate any triable issue of material fact regarding his employer's explanation that he was fired for unsatisfactory performance; his excuses served to confirm the validity of the employer's criticisms)).  Like the plaintiff in Taylor,1999 U.S. Dist. LEXIS 2583, at *27-28, Plaintiff's disagreement with the conclusions his supervisors drew from incidents that are admitted to have occurred is not evidence that the supervisor's appraisals are pretext, designed to mask discrimination. Billet, 940 F.2d at 825 ("The fact that an employee disagrees with an employer's evaluation of him does not prove pretext.").  Employers are entitled to make subjective determinations of their employees' performance "without the intrusion of third-party hindsight." Taylor, 1999 U.S. Dist. LEXIS 2583, at *29.  It is not the role of the Court to review or second guess the fairness or merit of Defendant's personnel and business decisions. Scaria v. Rubin, 117 F.3d 652, 655 (2d Cir. 1997); see also Simms v. Oklahoma ex rel. Dep't of Mental Health & Substance Abuse Servs.,

36

165 F.3d 1321, 1330 (10th Cir.) ("Our role is to prevent unlawful hiring practices, not to act as a

'super personnel department' that second guesses employers' business judgments.") (citations

omitted), cert. denied, 528 U.S. 815, 145 L. Ed. 2d 46, 120 S. Ct. 53 (1999); Fischbach v.

District of Columbia Dep't of Corrections, 86 F.3d 1180, 1183 (D.C. Cir. 1996) (concluding that

relevant issue was whether the employer honestly believed in the reasons it offered for not

promoting plaintiff, and not whether those reasons were the correct or desirable); Sanchez v.

Philip Morris Inc., 992 F.2d 244, 247 (10th Cir. 1993) ("Title VII is not violated by the exercise

of erroneous or even illogical business judgment.").  Accordingly, it is found that Plaintiff has

not presented sufficient evidence to demonstrate pretext.

ii.      Inference of Discrimination

Even if Plaintiff's evidence had been sufficient to create an issue of fact as to whether

Defendants' proffered explanation was pretextual, he still could not withstand summary

judgment.  A plaintiff in a discrimination case must do more than merely raise an issue of fact

regarding the validity of the employer's proffered explanation.  In Schnabel, 232 F.3d 83, the

Second Circuit held, in light of the Supreme Court's decision in Reeves, 530 U.S. 133, that a

court may grant a defendant's motion for summary judgment in a discrimination case "when a

plaintiff has offered only a prima facie case along with evidence that the defendant's stated

nondiscriminatory reasons for an adverse employment action are pretextual."  In order to defeat

summary judgment, a plaintiff must also present "evidence that would permit a rational

factfinder to infer that the discharge was actually motivated, in whole or in part, by

discrimination on the basis of [race, gender, and/or national origin]." Grady v. Affiliated Cent.,

130 F.3d 553, 561 (2d Cir. 1997).

37

Plaintiff has presented some evidence purporting to show that the real reason for

Defendants' actions was race-, gender-, or national origin-based discrimination.[28]  As discussed

earlier, circumstances contributing to an inference of discriminatory intent may include an

employer's criticism of either Plaintiff's or other employees' work "in ethnically degrading

terms," "invidious comments" about Plaintiff or other members of the protected classes to which

Plaintiff belongs, and/or evidence that other, similarly situated employees not in a protected class

were treated more favorably than Plaintiff. Chambers, 43 F.3d at 37.  Plaintiff has, however,

presented no evidence that Ms. Schuster made comments evincing a discriminatory animus

toward Plaintiff or that Defendants held discriminatory attitudes toward male, black, and/or

Nigerian persons or him in particular.  Nor is there any legitimate evidence that Plaintiff's race,

gender, and/or national origin were ever raised in conversations or mentioned in discussions

relating to his job performance and/or termination.

First, to support his claim that he was terminated for discriminatory reasons, Plaintiff

relies on a statement allegedly made by Ms. Schuster in response to his request to attend an off-

site training seminar.  According to Plaintiff, when he first approached her about the seminar, she

told him that he could not go, reasoning that "the topics of the seminar are not related to your

area." (See Ofoedu Memo. to Szenczy, Ex. V to Pl.'s Mem. Opp.)  Plaintiff then states that he

offered to pay for the seminar, at which point Ms. Schuster asked him, "can you afford to leave

---

[28]  In Schnabel, 232 F.3d 83, the Second Circuit held, in light of Reeves, 530 U.S. 133, that a court may grant a defendant's motion for summary judgment in a discrimination case "when a plaintiff has offered only a prima facie case along with evidence that the defendant's stated nondiscriminatory reasons for an adverse employment action are pretextual."  In order to defeat summary judgment, a plaintiff must also present "evidence that would permit a rational factfinder to infer that the discharge was actually motivated, in whole or in part, by discrimination on the basis of [race, gender, and/or national origin]." Grady, 130 F.3d at 561.

your areas?" (Id.)  He states that he was "appalled" by her statement. (Id.)  With no basis other

than his own intuition, Plaintiff asserts that this was a racially derogative remark which

constitutes direct evidence of discrimination. (Pl.'s Mem. Opp. 47.)  Plaintiff offers several

different interpretations of Ms. Schuster's remark.  For example, Plaintiff claims that Ms.

Schuster really meant that "a slave is only at home in his immediate environment which is the

cotton farm." (Ofoedu Aff. ¶ 36.)  He also interpreted her remark as meaning, "you farm slave

what business would [you] have with house slaves." (Id. ¶ 82.)  Plaintiff's attorney assigned a

slightly different meaning to the remark, asserting that Ms. Schuster really meant, "can a farm

slave co-mingle with house slaves." (Pl.'s Mem. Op. 47.)  Plaintiff's several different

interpretations are baseless and add nothing to the analysis.  Regardless of the different meanings

Plaintiff attempts to assign to her remark, the statement makes no reference to race, is not racially

derogatory in any sense, and is not connected to Plaintiff's race.  "[Plaintiff]'s belief, based on no

evidence other than gut instinct, that [Ms. Schuster] treated [him] with hostility because of [his]

race, cannot justifiably support an inference of discrimination when nothing in the record

remotely links [Ms. Schuster's] treatment of [him] to [his] race." Taylor v. Polygram Records,

No. 94 Civ. 7689 (CSH), 1999 U.S. Dist. LEXIS 2583, *45-47 (S.D.N.Y. Mar. 5, 1999) (citing

Moorer v. Grumman Aerospace, 964 F. Supp. 665, 674 (E.D.N.Y. 1997) (plaintiff's unsupported

"subjective feeling of 'racial tension'" from his supervisor failed to raise inference of

discrimination), aff'd without published opinion, 162 F.3d 1148 (2d Cir. 1998)); see also Shabat

v. Blue Cross Blue Shield, 925 F. Supp. 977, 988 (W.D.N.Y. 1996) ("It is more than well-settled

that an employee's subjective belief that he suffered an adverse employment action as a result of

discrimination, without more, is not enough to survive a summary judgment motion, in the face

of proof showing an adequate non-discriminatory reason.") (quoting Douglass v. United Serv. Auto. Ass'n, 65 F.3d 452, 459 (5th Cir. 1995)); Simmons v. AT&T, No. 96 Civ. 2844 (MBM) (LB), 1998 U.S. Dist. LEXIS 16904, *27 (S.D.N.Y. Oct. 28, 1998) ("Although [plaintiff] alleges discriminatory animus, she provides no evidence of differential treatment during the relevant time period. . . . Plaintiff's subjective belief is not enough."); cf. Grady, 130 F.3d at 561 (finding the plaintiff's allegation that her supervisor "smiled at her less approvingly" insufficient to infer age discrimination).

In an effort to show circumstances at St. Francis suggestive of discriminatory attitudes in general and/or a hostile work environment, Plaintiff submitted the deposition testimony of three different people.  Dr. Subrata Basu, the physician who diagnosed Plaintiff with "stress" and advised him to rest for two weeks, prompting his two-week medical leave, is—according to Plaintiff—a male foreigner who speaks English with a foreign accent.  In his deposition, Dr. Basu—who did not work at St. Francis—testified that he was once held at gun point in the St. Francis parking lot in the daytime and that he wrote ten letters to complain, but never received a response. (Basu Dep. 37:22-38:11, Sept. 27, 2005.)  Both Plaintiff and Dr. Basu claim that he would have received a response if he had been a white woman.  This evidence is irrelevant to Plaintiff's discrimination claim.  There is no evidence as to Dr. Basu's race or national origin, no evidence as to who disregarded his complaint, no evidence as to the motivation for disregarding his complaint, and no evidence that the person responsible for responding to his complaint knew his race, gender, or national origin.

Plaintiff also presents the deposition testimony of two St. Francis employees.  Barnaby Jara, an employee in the Medical Records Department at St. Francis, testified that he believed he

was "talked down on" because of his gender and race, saying that "I feel that Carol [Schuster], the way that she treats me, at least it's not the same way that she treats the other Caucasian employees.  She treats me in a way that . . . is not the same as she treats the other employees." (Jara Dep. 68:2-69:2, Nov. 9, 2005.)  Garfield Gordon, an African American male who worked as a medical records clerk for St. Francis, testified that he believed discrimination was practiced at St. Francis, saying that "being a black man, if you have an opinion and you express yourself, it doesn't sit well with the white ones.  It's like, one, they probably think you're getting upset or, two, they expect you to turn and walk away, not to respond to anything at all." (Gordon Dep. 10:7-13.)  Mr. Gordon testified that he had a "personal feeling" that things were not handled "properly" at certain times because he is a black man, (Id. at 10:14-23), and believes that a complaint that he made to his manager about a "terrible noise coming through the intercom" was not investigated because he was a black man. (Id. at 11:1-17.)  Mr. Gordon makes a vague claim that he was retaliated against for his complaint to the CEO of St. Francis about the noise coming through the intercom.  He alleges that another employee, a woman, was making the noise.  He claims that she falsely told Ms. Schuster and Ms. Downey that she was afraid of him and that they issued him a Final Written Warning, saying that if another employee makes a complaint about him, his employment could be terminated. (See Gordon Dep. 25:19-34:15.)  Mr. Gordon also discussed an incident in which a sexual harassment complaint against him (alleging that he referred to women as "hon, babe, sweetie," etc.), made by a group of women he identified as Puerto Rican, was investigated.  He testified that these things would be permitted if a white person had said them.  The charges, however, seem to have been dropped, as Mr. Gordon asserted that if the charges had been substantiated, he would have been fired. (Id. at 15:4-16:21.)

41

Mr. Gordon asserts that he believes that he has remained a clerk—the position he was hired to fill—for his entire seventeen years with St. Francis because he is not a white person, (Id. at 11:20-13:4), however, he does not claim that he applied for and/or was denied any other position within the department.  Finally, Mr. Gordon testified that at one time, he feared going to work because he "didn't know exactly what to expect on any given day," and as a result, took a month off for "stress." (Gordon Dep. 38:8-22.)

Both Mr. Jara and Mr. Gordon testified that there were no other black men in managerial positions. (Jara Dep. 69:7-25; Gordon Dep. 18:6-14.)  According to Mr. Jara, there are two female black managers now and there was one other female black manager there when Plaintiff was employed at St. Francis. (Jara Dep. 69:7-23.)  Both Mr. Jara and Mr. Gordon remain employed at St. Francis.

The testimony of these two employees is also not probative of discriminatory animus.  Plaintiff has presented no evidence as to the race or national origin or Mr. Jara.  The two employees present nothing other than their own speculation to support their claims that they were discriminated against on the basis of their race.  They cite no comments evincing a discriminatory motive on the part of Ms. Schuster and/or Ms. Szenczy, and produce no evidence showing that discrimination was involved in any way.

Finally, there is no evidence of a similarly situated non-black, female, and/or American employee being treated better than Plaintiff.  He discusses the fact that Faye Davis and Joyce Downey received pay increases during the course of their employment, however, Plaintiff also received a pay increase during the course of his employment. (See Defs.' Reply II at 5 n.3; see also Ofoedu Dep. I at 99:6-25, 108:9-19 (Plaintiff admits that effective April 28, 2002, he was

promoted to the position of Transcription and Record Processing Manager in the Medical

Records Department and received a an increase in pay).)  His conclusory claim that "other

employees," including "white and/or female manager[s] [and] employee[s]" were treated better

than him, (see Ofoedu Aff. ¶ 88), lacks any factual basis.  Plaintiff does not allege a single

alleged comparator by name, does not allege that any co-employee engaged in conduct of

"comparable seriousness," and does not otherwise attempt to establish that any alleged

comparator was similarly situated to him.[29] See Iuorno v. DuPont Pharms. Co., 129 Fed. Appx.

637, 641 (2005) (finding that the plaintiff had not raised an inference of discrimination when she

relied on conclusory allegations comparing herself to other "unidentified employees");

Shumway, 118 F.3d at 64-65 (plaintiff failed to allege that other, non-protected employees

engaged in the same misconduct as she, and thus, the Second Circuit held that she failed to prove

her prima facie case of gender discrimination).

      Plaintiff also asserts that the fact that Faye Davis was promoted to the role of Assistant

Director instead of him is indicative of discriminatory animus.[30]  Plaintiff makes the conclusory

claim that he is "more qualified" than Ms. Davis, however, he presents no evidence supporting

this claim.  Defendants, on the other hand, assert that Ms. Davis was promoted because Ms.

Schuster had observed her to be a better performer, she had more experience in the Medical

---

[29]    For such evidence to defeat summary judgment, Plaintiff must demonstrate that he was "similarly situated in all material respects" to the individuals to whom he compared himself, including a showing that these co-employees were subject to the "same performance evaluation and discipline standards." See Graham, 230 F.3d at 39-40.  Moreover, Plaintiff must show that similarly situated employees who went undisciplined engaged in conduct of "comparable seriousness." Id. at 40 (quoting McDonnell Douglas, 411 U.S. at 804).  Plaintiff's allegations in this regard are insufficient.

[30]    Ms. Davis is a black, Jamaican female, and therefore it is assumed that Plaintiff is asserting that her promotion over him was due to discrimination on the basis of gender and/or his Nigerian national origin.

Records Department, having been employed there for over twenty years, she had outstanding

performance evaluations throughout her tenure at St. Francis, and she was able to bring

Plaintiff's department back within acceptable performance standards while he was out on

medical leave.  The Second Circuit places a high burden on plaintiffs to show that a discrepancy

in qualifications supports the inference of discriminatory intent:

> When a plaintiff seeks to prevent summary judgment on the strength of a discrepancy
> in qualifications ignored by an employer, that discrepancy must bear the entire
> burden of allowing a reasonable trier of fact to not only conclude the employer's
> explanation was pretextual, but that the pretext served to mask unlawful
> discrimination. In effect, the plaintiff's credentials would have to be so superior to
> the credentials of the person selected for the job that "no reasonable person, in the
> exercise of impartial judgment, could have chosen the candidate selected over the
> plaintiff for the job in question."

Byrnie v. Town of Cromwell Bd. of Educ., 243 F.3d 93, 104 (2d Cir. 2001) (quoting Deines v.

Tex. Dep't of Protective & Regulatory Servs., 164 F.3d 277, 280-81 (5th Cir. 1999)); see also

Holt v. KMI-Continental, 95 F.3d 123, 130 (2d Cir. 1996) (plaintiff's "personal belief that she

was the most qualified person for the various positions" failed to show pretext where the facts

indicated that the promotions which plaintiff had sought were given to people with greater

experience than plaintiff).  Plaintiff has not shown here that he was more qualified that Ms.

Davis, or that "no reasonable person" could have chosen Ms. Davis over Plaintiff for the

Assistant Director position.

Like the plaintiff in Montana v. First Federal Sav. & Loan Assoc., 869 F.2d 100, 107 (2d

Cir. 1989), Plaintiff "presents no evidence, statistical or circumstantial, to justify an inference

that [St. Francis] made [gender, race, and/or national origin] a factor in its termination decision."

Specifically, Plaintiff presents no evidence that female, non-black, and/or American employees

were treated more favorably than he was, and presents no evidence that Defendants held

discriminatory attitudes toward male, black, and/or Nigerian persons or him in particular.

Although the Court on summary judgment draws all reasonable inferences in favor of Plaintiff,

as the party opposing summary judgment, he "may not rest upon the mere allegations of denials

of the adverse party's pleading," Fed. R. Civ. P. 56(e), and "some metaphysical doubt as to the

material facts" is insufficient." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574,

586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986) (citations omitted); see also Bickerstaff v. Vassar

Coll., 196 F.3d 435, 456 (1999) (a plaintiff's "feelings and perceptions of being discriminated

against are not evidence of discrimination") (internal brackets, quotations, and citations omitted).

Even if there were some evidence indicating that Defendants' asserted reasons were pretextual,

Plaintiff has presented no evidence that he was discriminated against because of his race, gender,

or national origin.  Accordingly, Defendants are entitled to judgment on Plaintiff's discrimination

claims.

            2.     Plaintiff's Retaliation Claim

     Title VII prohibits retaliation against an individual who has opposed a discriminatory

employment practice. 42 U.S.C. § 2000e-3(a).  Likewise, 42 U.S.C. § 1981 prohibits retaliation

against an individual who has asserted rights protected by § 1981. Hawkins v. 1115 Legal Serv.

Care, 163 F.3d 684, 693 (2d Cir. 1998).  Claims of retaliation brought under Title VII and § 1981

are analyzed under the three-part burden shifting analysis set forth in McDonnell Douglas. See

Tomka v. Seiler Corp., 66 F.3d 1295, 1308 (2d Cir. 1995) (Title VII); Cook v. CBS, Inc., 47 Fed.

Appx. 594 (2d Cir. 2002) (§ 1981).

     To make a prima facie case of retaliation, Plaintiff must show by a preponderance of the

evidence (1) that he participated in a protected activity known to Defendants; (2) the existence of an adverse employment action; and (3) a causal connection between the protected activity and the adverse employment action.  Slattery v. Swiss Reins. America Corp., 248 F.3d 87, 94 (2d Cir. 2001).  Again, a plaintiff's burden at this stage is de minimus. Id.  Once Plaintiff has established a prima facie case, the burden shifts to Defendants to show that they had a legitimate, non-discriminatory reason for the adverse employment action. Id. at 94-95.  If Defendants are able to make this showing, then the burden shifts back to Plaintiff to prove that the proffered reason is merely a pretext for unlawful retaliation. Id. at 95.  If Plaintiff can demonstrate that retaliation played a motivating part in an employment decision, the burden shifts back to the employer to demonstrate that it would have made the same decision based upon legitimate factors alone. See Cosgrove v. Sears, Roebuck & Co., 9 F.3d 1033, 1039 (2d Cir. 1993) (citing Price Waterhouse v. Hopkins, 490 U.S. 228, 244-45, 104 L. Ed. 2d 268, 109 S. Ct. 1775 (1989)).

It cannot be questioned that Plaintiff has established the second element of a prima facie case; Plaintiff's termination clearly constituted an adverse employment action. The issues that remain are (1) whether Plaintiff has made out the first element, i.e., whether he can show that he engaged in a protected employment action, and (2) whether he has made out the third element, i.e., whether he can show a causal nexus between the alleged protected employment action and Defendants' adverse employment action.

a.    *Protected Employment Action*

Defendants first argue that there is no evidence that Plaintiff has engaged in any protected activity. (Defs.' Mem. Supp. 30.)  To prove that he engaged in a "protected activity" for purposes of his retaliation claim, Plaintiff must show that he engaged in "protected participation or

46

opposition" to a discriminatory employment practice made unlawful under Title VII or Section 1981. <u>Sumner v. USPS</u>, 899 F.2d 203, 208 (2d Cir. 1990) (Title VII); <u>Hawkins</u>, 163 F.2d at 693 (§ 1981); <u>see also</u> 42 U.S.C. § 2000e-3(a).[31]

Although the memo from Plaintiff to Ms. Szenczy is an unsigned, undated note, Plaintiff's testimony that he sent the complaint to Ms. Szenczy is sufficient to authenticate the memo.  Defendants argue that Ms. Szenczy never received this memorandum and assert that Plaintiff failed to disclose this document in response to Defendants' First Set of Requests for Production, but produced it in time for him to mark it at the deposition of Ms. Szenczy. Defendants did not possess the document at that time and had not seen it prior to Ms. Szenczy's deposition.  In his Opposition brief, Plaintiff does not address his failure to testify to this memorandum at his deposition or his failure to otherwise identify any protected activity in support of his retaliation claim.  Giving Plaintiff the benefit of the doubt and construing the evidence in his favor, the Court will assume that the memo is a valid document and that Plaintiff sent it to Ms. Szenczy in March 2004.

To constitute protected activity, Plaintiff's memorandum to Ms. Szenczy must include a complaint of discrimination. <u>See</u> <u>Sumner</u>, 899 F.2d at 208 (to satisfy the requirements of the prima facie case, the plaintiff must show that he engaged in "protected participation or opposition under Title VII"); <u>Hawkins</u>, 163 F.2d at 693 (to be actionable under § 1981, the alleged retaliation must have been in response to the assertion of rights protected by § 1981).  Although the Court finds that Plaintiff made some form of general complaint to Ms. Szenczy in March

---

[31]     42 U.S.C. § 2000e-3(a) provides, in pertinent part, that: "It shall be an unlawful employment practice for an employer . . . to discriminate against any individual . . . because he has opposed any practice made an unlawful employment practice by this title [42 USCS §§ 2000e-2000e-17] . . . ."

2004, Defendants assert that the evidence does not show that he specifically complained to Ms. Szenczy or Ms. Currier that Ms. Schuster discriminated against him. (See Defs.' Rule 56(a)1 Statement ¶ 47.)  Plaintiff, in his deposition, stated that he complained to Ms. Szenczy that he was being treated unequally, but not specifically that Ms. Schuster discriminated against him on the basis of race, gender, and/or national origin. (See Ofoedu Dep. I at 258:8-20.)  He testified that in March 2004, he complained to Ms. Szenczy that Ms. Schuster was "dumping on" him and that she "expected 24 and 48 hour turnaround." (Id. at 256:11-12.)  He complained that Ms. Schuster's demands "made it very impossible for me to travel and see my family during the weekend." (Id. at 256:22-24.)  Plaintiff further complained to Ms. Szenczy that Ms. Schuster "had altered my time sheets. . . ." (Id. at 257:4-25.)  Plaintiff asserts several times in his Affidavit that he complained to Ms. Szenczy of discrimination, (Ofoedu Aff. ¶¶ 40, 81, 83), however, there is no evidence, in the memorandum or in his deposition, of a complaint of discrimination.

With regard to the "protected activity" element of a Title VII or § 1981 retaliation claim, the plaintiff need only "have had a good faith, reasonable belief that he was opposing an employment practice made unlawful by Title VII [or § 1981]." McMenemy v. City of Rochester, 241 F.3d 279, 285 (2d Cir. 2001).  Construing the evidence in Plaintiff's favor, the Court will assume that Plaintiff's assertion that he complained about being treated "unequally" constituted protected activity under Title VII and § 1981.

        b.     *Causal Connection between Protected Employment Action and Termination*

To establish his prima facie case, Plaintiff finally must establish the existence of a causal connection between his protected activity and his termination.  Plaintiff can demonstrate a causal

connection "indirectly by showing that the protected activity was followed closely by discriminatory treatment," "through other evidence such as disparate treatment of fellow employees who engaged in similar conduct," or "directly through evidence of retaliatory animus directed against a plaintiff by the defendant." De Cintio v. Westchester County Medical Center, 821 F.2d 111, 115 (2d Cir. 1987) (internal citations omitted).  Although temporal proximity may be sufficient to demonstrate a causal nexus, "[w]here timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise." Slattery, 248 F.3d at 95.

Plaintiff asserts that his memorandum of complaint was submitted to Ms. Szenczy on May 5, 2004 and that the Final Written Warning was given to him two days later.  He argues that the temporal proximity between the two events is evidence that the Final Written Warning was issued in retaliation for his complaint. (Pl.'s Mem. Opp. 38.)  Plaintiff's employment, however, was not actually terminated until June 15, 2005, over thirteen months later.  Although Plaintiff has demonstrated close temporal proximity between the complaint and the Final Written Warning, the adverse employment action at issue here is his termination.  Plaintiff has not shown a causal connection between his complaint and his termination and thus is unable to establish a prima facie case of retaliation. See Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 273-74, 121 S. Ct. 1508, 149 L. Ed. 2d 509 (2001) (holding that although temporal proximity alone may show causation, the proximity must be very close; twenty months between the protected activity and the adverse action is too long); Hollander v. American Cyanamid Co., 895 F.2d 80, 85-86 (2d Cir. 1990) (a three and one-half month interval between the protected activity and the alleged retaliation was insufficient to establish a causal connection).

c.    *Evidence of Pretext*

Even if the Court had found that Plaintiff had met his de minimus burden of establishing his prima facie case, he is unable to show that Defendants' legitimate, nondiscriminatory reasons for his discharge—i.e., Plaintiff's poor job performance and failure to improve—were merely a pretext for retaliation. See Reeves, 530 U.S. at 143; Slattery, 248 F.3d at 95.  As set forth above, with regard to Plaintiff's discrimination claim, there is no genuine issue of material fact with regard to Defendants' reasons for firing Plaintiff.  Defendants' concerns about Plaintiff's performance issues are well-documented.  Plaintiff has not established the existence of a genuine issue of material fact as to Defendants' proffered reasons for his terminations, nor has he shown that retaliation was a motivating factor in Defendants' decision to terminate his employment. Although there was close temporal proximity between Plaintiff's complaint and the issuance of his Final Written Warning, more evidence is necessary to establish pretext. See Simpson v. N.Y. State Dep't of Civ. Servs., 166 Fed. Appx. 500, 502 (2d Cir. 2006) ("While the temporal proximity of these events gives rise to an inference of retaliation for the purposes of appellant's prima facie case, without more, such temporal proximity is insufficient to satisfy appellant's burden to bring forward some evidence of pretext."); Quinn v. Green Tree Credit Corp., 159 F.3d 759, 770 (2d Cir. 1998) (holding that a strong temporal connection between the plaintiff's complaint *along with* other circumstantial evidence is sufficient to raise an issue with respect to pretext).  Accordingly, Defendants are entitled to judgment on Plaintiff's retaliation claim.

## IV.    CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment [Doc. No. 66] is **granted** and Defendants' Motion to Strike [Doc. No. 77] is **granted in part** and **denied in part**.

The Clerk shall close the case.

      SO ORDERED.

Dated at New Haven, Connecticut, September  _13_ , 2006.

 

                           /s/
                   _____
                   Peter C. Dorsey, U.S. District Judge
                       District of Connecticut